**BROTHERHOOD RAILWAY CARMEN OF the UNITED STATES AND CANADA, AFL–CIO–CLC, Plaintiff-Appellant,**

v.

**NORFOLK AND WESTERN RAILWAY COMPANY, Defendant-Appellee.**

No. 83–3496.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 1, 1984.

Decided Oct. 4, 1984.

Harold A. Ross, Ross & Kraushaar Co., L.P.A., Cleveland, Ohio, Newton G. McCoy (argued), Friedman, Weitzman & Friedman, P.C., St. Louis, Mo., for plaintiff-appellant.

Robert G. Boes, Arter & Hadden, Cleveland, Ohio, William B. Poff (argued), Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., for defendant-appellee.

Before KEITH and CONTIE, Circuit Judges, and BROWN, Senior Circuit Judge.

CONTIE, Circuit Judge.

The Brotherhood of Railway Carmen of the United States and Canada appeals the district court's dismissal of its complaint. The Carmen had sought to enjoin the defendant Norfolk & Western Railway Company from ceasing to pay "checking in and out pay" before exhausting the negotiation and mediation procedures of section 6 of the Railway Labor Act, 45 U.S.C. § 156. The Carmen alleged that Norfolk & Western's action is a unilateral change in rates of pay, rules or working conditions and that this case therefore presents a "major" dispute within the district court's injunctive powers. The district court held that Norfolk & Western's action is arguably sanctioned by the existing collective bargaining agreements and that this case therefore involved a "minor" dispute within the exclusive jurisdiction of the National Railroad Adjustment Board under section 3 of the Act, 45 U.S.C. § 153. The district court therefore dismissed the action. We affirm.

## I.

Norfolk & Western, in the course of acquiring and merging with other railroad companies, has bound itself to several collective bargaining agreements previously negotiated between the Carmen and the predecessor railroad companies. Three agreements, commonly known as the Norfolk & Western agreement, the Virginian agreement and the Nickle Plate agreement[1] are involved in this case. Under each agreement, Norfolk & Western has paid certain of its employees for checking in and checking out. According to the terms of the agreements, this task was to be performed on the employees' own time, several minutes before and after the actual

---

1. These names derive from the names of the railroad companies with which the agreements were originally negotiated.

hours of their shifts. Rule 51 of the Norfolk & Western agreement provides:

> Employees required to check in and out and make out service cards on their own time, will be allowed one (1) hour at straight-time rate for each pay-roll period, provided they have worked twenty-four (24) hours during the payroll period.

Rule 47 of the Virginian agreement provides:

> At the close of each week one (1) minute for each hour actually worked during the week will be allowed employes for checking in and out.

Finally, Rule 51 of the Nickle Plate agreement provides:

> Effective as of September 1, 1949, employees will be allowed one and two-tenths cents for each hour actually worked for checking in and out and making out service cards. The practice of employes checking in and out on their own time will be continued.

By a notice dated May 16, 1983, Norfolk & Western made the following announcement to its employees:

> Effective May 24, 1983, employes will not be required to register on and off duty on their own time. Payments previously received in consideration for this service, commonly known as "checking in and out" pay, will also be discontinued.

Although agreements to pay railroad employees for checking in and out on their own time are rooted in the distant past,[2] the general contours of the practice, as it traditionally has been used, are relatively clear. The railroads originally had time clocks at which employees had to pick up a card and have it time-stamped. It naturally took some time for all employees in one shop to complete this process. The railroads, wanting their employees to be at their work stations and actually working during the full time of their shift, began requiring their employees to check in before the start of the working day and check out after their shifts ended. Railroad employees responded by successfully demanding to be paid for this extra time the railroads required of them.

Over time, Norfolk & Western streamlined the process for reporting to work and employees eventually had to do less in order to check in and check out. Thus, in more recent times, an employee merely had to sign a time slip before the beginning of the day and give it to his supervisor, who filled out the hours the employee had worked, after the end of the day. In 1976, Norfolk & Western advanced even further by installing a computer system to monitor its employees' hours and the company's payroll accounting. The time slips were still used, however, as a means of auditing the results generated by the computer system. An official of Norfolk & Western testified that the company did not have sufficient confidence in the computer system to dispense with the time slips until May 1983. Nonetheless, he admitted that, with the benefit of hindsight, he now believes that time slips were unnecessary as early as 1977 or 1978. The witness testified that under the system initiated on May 24, 1983 the employees are not required to perform any act in order to report for work or to report their hours. The computer system has an internal auditing program and further auditing is provided by the employees' field supervisors.

The Carmen have contended that Norfolk & Western's action is a unilateral change in the "rates of pay, rules, or working conditions" within the meaning of section 6 of the Act and sought an injunction to restrain Norfolk & Western from implementing its proposed change until after the procedural requirements of that section have been completed.[3] The Carmen filed the

---

**2.** At the hearing below, counsel for both parties agreed that the practice dates as far back as 1919 to 1920. Neither side was able to inform the trial court of the circumstances of the initial agreement providing for checking in and out pay.

**3.** Section 6 provides:

> Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting *rates of pay, rules, or working conditions,* and the time and place for the begin-

instant action on May 23, 1983 in an attempt to stop this proposed action with a status quo injunction. On May 27, 1983, following a hearing, the district court denied the Carmen's request for a temporary restraining order. A hearing on the request for a preliminary injunction and on Norfolk & Western's motion to dismiss was held on June 3, 1983. At the conclusion of the hearing, the district court issued an oral ruling that the dispute was "minor" and therefore within the exclusive jurisdiction of the National Railroad Adjustment Board.[4] A written memorandum opinion and order, filed June 10, 1983, formalized the court's oral ruling.

## II.

■■■ In order to put this case in perspective, a brief review of the Railway Labor Act is necessary. Under the Act, disputes between railroads and their employees fall into two "sharply distinguished" categories. *See Elgin, Joliet & Eastern Railway v. Burley,* 325 U.S. 711, 722, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945), *aff'd on rehearing,* 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946). The first category, by tradition known as "minor" disputes,

> contemplates the existence of a collective agreement already concluded or ... a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper applica-

tion of a particular provision with reference to a specific situation or to an omitted case.... In either case the claim is to rights accrued, not merely to have new ones created for the future.

*Id.,* 325 U.S., at 723, 65 S.Ct., at 1290. In contrast, the second category, known as "major" disputes,

> relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

*Id.* The distinction between minor and major disputes has important procedural consequences.

■■■ Generally, major disputes are "left for settlement entirely to the process of noncomulsory adjustment." *Id.* at 724, 65 S.Ct. at 1290. A detailed procedure is provided in 45 U.S.C. §§ 152, 155, 156, 157 and 160 for moving the dispute through initial conference and negotiation, submission to the National Mediation Board, voluntary arbitration and, possibly, investigation by a special emergency board appointed by the President. *See Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109,

---

ning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, *rates of pay, rules or working conditions shall not be altered by the carrier until the controversy has been finally acted upon,* as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

*See* 45 U.S.C. § 156 (emphasis added).

4. Section 3 of the Act provides for compulsory and binding arbitration of "minor" disputes by the National Railroad Adjustment Board. *See* 45 U.S.C. § 153(first)(i). As an alternative, railroads and collective bargaining agents may establish their own arbitration panels by private agreement. *See* 45 U.S.C. § 153(second). Generally speaking, these Boards function in the same manner as the National Railroad Adjustment Board. *See generally Cole v. Erie Lackawanna Railway,* 541 F.2d 528 (6th Cir.1976), *cert. denied,* 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977). By letter dated May 23, 1983, Norfolk & Western informed the Carmen that it intended to submit this dispute to such a privately established arbitration panel.

1115, 22 L.Ed.2d 344 (1969).[5] The entire process of resolving major disputes entails only conciliation, mediation, and induced negotiation. "[C]ompulsions go only to insure that those procedures are exhausted before resort can be had to self-help. No authority is empowered to decide the dispute and no such power is intended, unless the parties themselves agree to arbitration." *Burley*, 325 U.S. at 725, 65 S.Ct. at 1291. Thus, as to major disputes, the only form of restraint in the Act is the prohibition against unilateral action on the subject of the major dispute pending the exhaustion of the Act's procedures. *See* 45 U.S.C. §§ 152 (seventh), 156; *Detroit & Toledo Shore Line Railroad v. United Transportation Union*, 396 U.S. 142, 149, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969). The duty to uphold the status quo may be enforced by obtaining injunctive relief in a federal district court. *See United Transportation Union v. Penn Central Transportation Co.*, 505 F.2d 542, 543 (3d Cir.1974) (per curiam); *United Transportation Union v. Baker*, 499 F.2d 727, 728 (7th Cir.), *cert. denied*, 419 U.S. 839, 95 S.Ct. 69, 42 L.Ed.2d 66 (1974).

■ In contrast to major disputes, minor disputes under the Act are subject to compulsory and binding arbitration. *See* 45 U.S.C. § 153(first) (i). This task is performed, upon the request of one of the parties, by the National Railroad Adjustment Board or a privately established arbitration panel. *See supra* note 4. When only a minor dispute is involved, there is no duty to maintain the status quo. *See Ruby v. TACA International Airlines*, 439 F.2d

1359, 1362 (5th Cir.1971). Moreover, the arbitration panels established by the Act have "primary and exclusive jurisdiction" to resolve minor disputes. *Local 1477 United Transportation Union v. Baker*, 482 F.2d 228, 230 (6th Cir.1973). Judicial review of the arbitration panels' decisions is extremely limited. *See Union Pacific Railroad v. Sheehan*, 439 U.S. 89, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978) (per curiam).

■ These principles are well established and not disputed in this case. The type of issue which is presented in this case was captured in apt language in *Baker:*

> [D]ifficulty arises when ... one party views the controversy as a dispute over the proper interpretation of the existing contract and agreed rules, while the other charges its adversary with an attempt to impose unilaterally a new requirement that changes the existing agreement.

*Baker*, 482 F.2d at 230. The test for determining if a dispute involves only the interpretation of an existing agreement, and is therefore minor, or involves a unilateral change in working conditions, and is therefore major, inquires whether the disputed action can "arguably be justified by the existing agreement" or, in other words, whether the construction of the agreement which would sanction the action is "not obviously insubstantial." *Id.*

### III.

Norfolk & Western construes the three agreements to obligate the railroad to pay employees for checking in and out on their

---

5. *Railroad Trainmen* provided the following concise summary of the process for resolving major disputes:

> The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advanced written notice.... The parties must confer ... and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist.... If mediation fails, the Board must endeavor to induce the parties to submit the

controversy to binding arbitration, which can take place, however, only if both consent.... If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute.... While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo*.
394 U.S. at 378, 89 S.Ct. at 1115 (citations omitted).

own time only so long as the employees are required to perform that service. Since employees are no longer required to check in and out on their own time, it argues, the railroad may discontinue the payments. The Carmen's position is that the practice of employees checking in and out on their own time has been in disuse for many years but Norfolk & Western has continued to make the payments. This past practice, the Carmen argue, demonstrates that the employees' obligation to check in and out on their own time and the railroad's obligation to pay checking in and out pay are distinct and independent. Thus, it is argued, Norfolk & Western is still obligated to make the disputed payments under the terms of the contract.

The Carmen attempted to introduce evidence at the hearing below which would have supported their claim that Norfolk & Western's current action is inconsistent with their prior practice. They offered to show that employees were consistently signing their time slips during working hours, not before and after working hours, not before and after working hours, prior to the May 1983 announcement. The district court declined to hear this testimony, ruling that "historical practice ... cannot modify or alter specific agreement provisions." It held that, considering only the language of the three agreements and not the actual practices of the railroad and the employees, the cessation of checking in and out pay was "arguably" justified by the agreements. The Carmen contend that the district court erred in not allowing evidence of prior practice. They argue that the parties' prior course of performance must be examined to determine whether the railroad's construction of the agreement is arguable and not obviously insubstantial.[6]

This argument is based largely on *Detroit & Toledo Shore Line Railroad v. United Transportation Union,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). *Shore Line,* the Carmen argue, establishes that past practice must be considered in determining whether a dispute is major or minor. This assertion, however, rests on an incorrect reading of *Shore Line.* That case dealt only with the *scope* of the status quo requirement in a dispute that all assumed to be major. *See* 396 U.S. at 143, 90 S.Ct. at 295 ("This case raises a question concerning the extent to which the Railway Labor Act of 1926 imposes an obligation upon the parties to a railroad labor dispute to maintain the status quo ....") (footnote omitted). Moreover, the collective bargaining agreement in that case was silent on the propriety of the action undertaken by the railroad. The Court merely held that even though the agreement, because of its silence on the issue, did not forbid certain actions, those actions could not be taken unilaterally if the result would be a change in the "actual, objective working conditions." *See id.* at 152–53, 90 S.Ct. at 300–01. In contrast, the present case involves a determination of whether a major or minor dispute is involved when a railroad acts unilaterally under a contract that does address the action taken.

The problem with the proffered evidence of prior practice is not that it proves nothing, but rather that it proves too little. The evidence is not devoid of probative value, but the probative value that the evidence does have, under the facts of this case, could not possibly change the result. It must be remembered that in cases where a railroad asserts that its action is justified by the terms of an agreement, courts are

---

**6.** We reject at the outset the Carmen's argument that Norfolk & Western's February 1983 offer to eliminate the provisions in question indicates that this is a major dispute. First, the duty to negotiate extends to both major and minor disputes. *See* 45 U.S.C. § 152(second); *Burley,* 325 U.S. at 727 & n. 23, 65 S.Ct. at 1292 & n. 23. Second, precluding a railroad from asserting that a dispute is minor because it has previously proposed eliminating the provisions in question would discourage railroads from making an attempt at negotiation before resorting to unilateral action. This would be contrary to the purposes of the Act. Third, courts have held that a party is generally not estopped by its prior characterization of a dispute as major or minor. *See St. Louis Southwestern Railway v. United Transportation Union,* 646 F.2d 230, 233–34 (5th Cir.1981).

called upon to determine only whether the railroad's contention is arguable, not to determine whether that contention is correct. Given our limited function in this case, the proffered evidence cannot affect the outcome.

 The first step in cases of this type is, of course, to look at the agreement's language. If that language reveals that the railroad's position is obviously insubstantial and not even arguably correct, then the dispute is determined to be major and there is no need to resort to an examination of past practices. Past practices logically are relevant only when a railroad has already presented an arguably correct interpretation of the agreement. When this point has been reached, however, the inquiry is at an end. Past practice cannot make a construction which has already been determined to be arguable frivolous or a substantial argument insubstantial. Evidence such as this is to be used in determining the ultimate meaning of the agreement, *see Order of Railway Conductors of America v. Pitney*, 326 U.S. 561, 567, 66 S.Ct. 322, 325, 90 L.Ed. 318 (1946), but that is a task for arbitrators, not for courts. When making only a provisional determination that the railroad's action is arguably sanctioned by the agreements, evidence of past practice is not dispositive in the face of contrary indications from the agreements' language.

This becomes apparent from examining the facts of this case. The Norfolk & Western agreement provides that the pay will be given to "[e]mployees *required* to check in and out and make out service cards on their own time." This language clearly makes the railroad's position arguable. Pay for checking in and out is, at least arguably, only to be given to those employees who are "required" to check in and out on their own time. Similarly, the Virginian agreement provides that the pay "will be allowed employes *for* checking in

and out." It clearly is arguable that this language means that the pay is to be given only in return for the performance of the act. The Nickle Plate agreement presents only a somewhat more difficult problem. After stating that employees will be paid "*for* checking in and out and making out service cards," it states that the "practice of employes checking in and out on their own time will be continued." The Carmen argue that this provision means that the railroad is absolutely obligated to continue the practice of having employees check in and out on their time and to pay them for that service. A literalistic interpretation might or might not yield that result. Another interpretation, however, would be that the last sentence is a promise by the employees to check in and out on their own time, that this obligates only the employees and not the railroad, and that the railroad's only obligation is found in the preceding phrase, requiring it to make the payments only "*for* checking in and out." Thus, when the railroad discontinues the practice of checking in and out and the employees are no longer obligated to check in and out on their own time, the railroad's coextensive promise to pay lapses. Since this latter interpretation is arguably correct, it does not matter that the Carmen's construction is also tenable.[7]

 If one considers past practice, nothing is changed. It could be argued that the practice of not requiring employees to check in and out on their own time in order to obtain this pay, if proven, demonstrates that the agreements had been modified by tacit agreement. It could be argued that this practice demonstrates that the parties understood the agreements to carry the construction now urged by the Carmen. But these are merely arguments to be weighed against other arguments; they provide a possible basis for reaching a decision but they do not dictate a decision.

---

**7.** Our reading of the agreements is supported by the decision of an arbitration panel considering the same language's application to a dispute over checking in and out pay between Norfolk & Western and a different union. That panel agreed with Norfolk & Western's interpretation of the three provisions in issue here. Thus, one arbitration panel has found Norfolk & Western's interpretation to be not merely arguable, but correct.

In short, they do not change the fact that the railroad's construction of the agreements' language is arguable and not obviously insubstantial.

For the reasons stated above, we conclude that the district court correctly determined that this case involves only a minor dispute and that injunctive relief was therefore not available. Accordingly, the judgment of the district court is AFFIRMED.