**DIVISION NO. 1, DETROIT, BROTHER-HOOD OF LOCOMOTIVE ENGI-NEERS, Plaintiff–Appellee (85–1782), Plaintiff–Appellant (86–1016),**

v.

**CONSOLIDATED RAIL CORPORA-TION, Defendant–Appellant (85–1782), Defendant–Appellee (86–1016).**

Nos. 85–1782, 86–1016.

United States Court of Appeals, Sixth Circuit.

Argued May 14, 1987.

Decided April 14, 1988.

Rehearing and Rehearing En Banc Denied in No. 86–1016 May 31, 1988.

Harold M. Provizer, Provizer, Eisenberg, Lichtenstein & Pearlman, P.C., Marilyn A. Madorsky (argued), Southfield, Mich., for Div. No. 1, Detroit Broth. of Locomotive Engineers.

Lucy S.L. Amerman (argued), Dennis Alan Arouca, Philadelphia, Pa., Gary E. Murg, Nancy S. Katz, Pepper, Hamilton & Scheetz, Detroit, Mich., Cary Alan Metz, Philadelphia, Pa., for Consol. Rail Corp.

Before JONES and RYAN, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

CELEBREZZE, Senior Circuit Judge.

These consolidated appeals arise from the district court's grant of a status quo injunction against defendant Consolidated Rail Corporation (Conrail), and its subsequent order requiring plaintiff Division No. 1, Detroit, Brotherhood of Locomotive Engineers (BLE) to post a $750,000 bond as security for the injunction. Conrail contends on appeal that under the Railway Labor Act (Act), 45 U.S.C. §§ 151–163 (1982), the district court was without jurisdiction to issue the injunction because the instant case presents a "minor" dispute, and not a "major" dispute as the district court held. In the consolidated appeal, BLE argues that the district court abused its discretion in ordering BLE to post the bond. We hold that the district court erred in finding this dispute to be "major," and therefore, that the status quo injunction was improvidently granted. We further conclude that the court abused its discretion in ordering BLE to post a $750,000 bond. Accordingly, we vacate the injunction and the bond, and remand the case to the district court.

## I. FACTS

Defendant Conrail, a "carrier" as defined in the Railway Labor Act, 45 U.S.C. § 151, First (1982), operates a freight railroad system in fourteen states and the District of Columbia. Under the auspices of the Regional Rail Reorganization Act of 1973 (RRRA), 45 U.S.C. §§ 701–797m (1982), Conrail began its operation in 1976 on rail properties inherited from several railroads, including properties in the Detroit area previously owned by Penn Central Transportation Co. (Penn Central). The Penn Central was similarly the product of the 1968 merger of the Pennsylvania Railroad and the New York Central Railroad.

Plaintiff BLE is the authorized "representative," 45 U.S.C. § 151, Sixth (1982), of the locomotive engineers employed by Conrail in the Detroit area. BLE represents both "yard engineers," who work within train terminals, and "road engineers," who operate the trains between terminals.

The instant dispute arose from Conrail's unilateral decision to move the "on-off duty point" for the Detroit-based road engineers in Conrail's "Detroit/Toledo pool." The term Detroit/Toledo pool identifies those locomotive engineers and trainmen who operate Conrail's trains between the two cities. The on-off duty point is where the road engineers must report for work each day. If the road engineers are scheduled to operate a train that is departing from a location other than the on-off duty point, they are then transported, at Conrail's expense, to the point of departure. Similarly, at the end of their work day, Conrail returns the road engineers to the on-off duty point.

The on-off duty point for the Detroit-based road engineers in the Detroit/Toledo pool had been located at Livernois Yard since Conrail established the pool in 1981. On September 20, 1984, however, Conrail notified the pool that effective October 1, the on-off duty point would be changed to North Yard, which is approximately ten miles from Livernois Yard. BLE objected to the change on behalf of the road engineers in the pool, asserting that the on-off duty point had been fixed at Livernois Yard by collective bargaining and that Conrail could not unilaterally alter the existing agreements. Conrail responded that the existing agreements specifically permitted it to change the on-off duty point for the pool, consequently rejecting BLE's requests to negotiate or to submit the dispute for mediation. The change went into effect as scheduled.

In December, 1984, BLE brought suit against Conrail, moving the district court for a status quo injunction under the Railway Labor Act. After hearing several days of testimony, the district court finally held on August 14, 1985, that Conrail had unilaterally changed a previously negotiated working condition, thus causing a "major" dispute under the Act. The court therefore granted BLE's motion and issued an injunction mandating that Conrail return the on-off duty point to Livernois Yard pending exhaustion of statutory procedures. Conrail appeals the grant of the status quo injunction.

Conrail complied with the injunction, but subsequently moved the court to order BLE to post a bond in excess of $1 million as security for the injunction under Rule 65(c), Fed.R.Civ.P. The district court concluded that requiring security was permissible under the Act and ordered BLE to post a $750,000 bond. BLE timely appealed the bond order.

## II. STATUS QUO INJUNCTION (NO. 85–1782)

The validity of the district court's grant of a status quo injunction depends on whether this dispute should be categorized as major or minor under the Railway Labor Act. *See Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 722–28, 65 S.Ct. 1282, 1289–92, 89 L.Ed. 1886 (1945); *Brotherhood of Railway Carmen v. Norfolk & W. Ry.*, 745 F.2d 370, 374–75 (6th Cir.1984); 45 U.S.C. § 151a(4) & (5) (1982). "Major" disputes concern "the formation of collective bargaining agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy." *Elgin*, 325 U.S. at 723, 65 S.Ct. at 1290. Major disputes thus

"present the large issues about which strikes ordinarily arise with the consequent interruptions of traffic the Act sought to avoid." *Elgin*, 325 U.S. 723–24, 65 S.Ct. 1289–90; *see* 45 U.S.C. § 151a(1) (1982). To avoid work stoppages that would likely ensue from major disputes, the Act requires the parties to uphold the status quo while the Act's dispute resolution procedures are in operation. *See* 45 U.S.C. § 156 (1982) ("working conditions shall not be altered" during major disputes); *id.* § 152, Seventh; *Detroit & T.S.L. R.R. v. United Transp. Union*, 396 U.S. 142, 149, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969); *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969). It is well settled that "[t]he duty to uphold the status quo may be enforced by obtaining injunctive relief in federal district court," *Railway Carmen*, 745 F.2d at 375, and that such an injunction will issue without regard for the traditional requisites in equity for obtaining injunctive relief.[1] *See Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington N. R.R.*, 802 F.2d 1016, 1021 (8th Cir.1986); *United Transp. Union v. Penn Central Transp. Co.*, 505 F.2d 542, 543 (3d Cir.1974); *United Transp. Union v. Burlington Northern, Inc.*, 458 F.2d 354, 357 (8th Cir.1972); *Southern Ry. v. Brotherhood of Locomotive Firemen*, 337 F.2d 127, 133–34 (D.C. Cir.1964); *cf. Shore Line*, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969) (upholding issuance of status quo injunction under Act during a major dispute without discussing equitable constraints).

"Minor" disputes, on the other hand, presuppose an existing collective bargaining agreement; they are essentially contract grievances, relating "either to the meaning or proper application of a particular provision with reference to a particular situation or omitted case." *Elgin*, 325 U.S.

---

1. By delaying unilateral action, a status quo injunction unconstrained by equitable requirements not only furthers Congress' primary intention of "avoid[ing] any interruptions" to rail traffic, 45 U.S.C. § 151a(1), but also facilitates Congress' goal of "provid[ing] for the prompt and orderly settlement" of all major disputes, *id.* § 151a(4), according to the statutory procedures, *see id.* § 152, Seventh, which include "the traditional processes of negotiation, mediation, voluntary arbitration, and conciliation." *Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 725, 65 S.Ct. 1282, 1291, 89 L.Ed. 1886 (1945); *see Detroit & T.S.L.R.R. v. United Transp. Union*, 396 U.S. 142, 148, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969); 45 U.S.C. §§ 152, 155–57 & 160 (1982).

at 724, 65 S.Ct. at 1290; *see Railway Carmen,* 745 F.2d at 374. Minor disputes "seldom produce strikes, though in exaggerated circumstances they may do so." *Elgin,* 325 U.S. at 724, 65 S.Ct. at 1290. In view of the less severe nature and consequences of minor disputes, Congress imposed no duty to maintain the status quo, opting instead for resolution of minor disputes through compulsory and binding arbitration. *Railway Carmen,* 745 F.2d at 375. The district court, therefore, is not free to enjoin unilateral action by a party during a minor dispute, but may do so in only more limited circumstances.[2]

Distinguishing between major and minor disputes has proven elusive. The union, in seeking federal court intervention, will undoubtedly argue that the railroad unilaterally changed the collective bargaining agreement, while the railroad will contend that the existing agreement authorized its challenged action. To resolve this inevitable conflict, we adopted the following standard in *Railway Carmen:*

> The test for determining if a dispute involves only the interpretation of an existing agreement, and is therefore minor, or involves a unilateral change in working conditions, and is therefore major, inquires whether the disputed action "can arguably be justified by the existing agreement" or, in other words, whether the construction of the agreement which would sanction the action is "not obviously insubstantial."

745 F.2d at 375 (quoting *Local 1477, United Transp. Union v. Baker,* 482 F.2d 228, 230 (6th Cir.1973)); *see also International Longshoremen's Ass'n, Local 158 v. Toledo Lakefront Dock & Pellet Co.,* 776 F.2d 1341 (6th Cir.1985). As applied to this case, the dispositive question is whether Conrail's unilateral change of the on-off duty point is "arguably justified" by the existing labor agreements.

The parties direct our attention to four collective bargaining agreements:

(1) 1979 Blue Book, the master collective bargaining agreement;

(2) 1967 Agreement;

(3) 1969 Agreement; and

(4) 1982 Agreement.

The district court adopted BLE's contention that the 1969 Agreement, which designated Livernois Yard as the on-off duty point for the Detroit/Toledo pool, was "controlling." Without directly addressing Conrail's arguments to the contrary, the court stated that Conrail's "defenses are without merit." The court accordingly held that Conrail's unilateral alteration of the 1969 Agreement was a major dispute under the Act and issued the status quo injunction. For the following reasons, we reverse.

Preliminarily, we note that the district court's written opinion is inconsistent with this circuit's precedent. The decision nowhere mentions our decision in *Railway Carmen,* nor does it purport to apply the "arguable justification" standard. *See Railway Carmen,* 745 F.2d at 375. Rather, in finding the 1969 Agreement "controlling" and Conrail's "defenses ... without merit," the district court appears to have undertaken the task of deciding which party's interpretation of the labor agreements was correct. As our previous discussion indicates, however, the federal court's role is more limited: when faced with a motion for a status quo injunction under the Railway Labor Act, the court need only inquire whether the nonmoving party's actions were "arguably justified by the existing agreement," or whether the nonmoving party's interpretation of the existing agreement is "not obviously insubstantial." *Id.* at 375; *see Toledo Lakefront,* 776 F.2d at 1343–44. The district court need not address the more searching question of which party's view of the existing agreement is correct. We therefore turn to the disputed agreements to determine whether they arguably justify Conrail's unilateral change

---

**2.** For example, a federal court may enjoin unilateral action in a minor dispute to safeguard the jurisdiction of the arbitration panel. *See Brotherhood of Locomotive Eng'rs v. Missouri–* *K.–T. R.R.,* 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960); *Brotherhood of R.R. Trainmen v. Chicago River & I. Ry.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). *See also infra* note 10.

in the on-off duty point for the Detroit/Toledo pool.[3]

The primary collective bargaining agreement between Conrail and BLE is the 1979 Basic Schedule Agreement, also referred to as the "Blue Book." The 1979 Blue Book superseded all prior agreements between the parties, except for existing "work equity" agreements. Work equity agreements were negotiated between unions and railroads prior to, but in anticipation of, a proposed merger or consolidation. Without work equity, no bargained-for mechanism would be in place to resolve the inevitable conflicting claims of seniority from workers previously employed at separate facilities, or to protect employees whose positions were eliminated in reorganization. Through work equity agreements, therefore, the union insured that previously accrued seniority and other employment rights would be respected in allocating work at the merged facility.

Two pre–1979 work equity agreements are relevant to the instant case. The 1967 Detroit Consolidation Agreement ("1967 Agreement") was negotiated between BLE and Conrail's predecessors, the Pennsylvania and the New York Central Railroads, and it became effective upon their merger into the Penn Central in 1968. Section VII.C states:

> Road and Yard employees *may be required* to report and be relieved at designated points in the consolidated terminal. . . .

(emphasis added). Conrail relies on this provision, as incorporated by the 1979 Blue Book, to support its contention that it had the unilateral right to designate the on-off duty point for the Detroit/Toledo pool.

We agree with Conrail that the 1967 Agreement standing alone arguably permits the railroad to change the on-off duty point for road engineers without consulting its employees or their union.[4] BLE contends, however, that this provision is inapplicable to the Detroit/Toledo pool by virtue of the "1969 Agreement," the second work equity agreement in question.

The 1969 Agreement established work equity in the event that the railroad decided to establish a Detroit/Toledo pool. The 1969 Agreement was negotiated between BLE and Penn Central, but was not implemented until 1981. Section IV.C states:

> At Detroit, crews of the pool and extra crews called in accordance with the provisions of this Agreement will go on and off duty at [Livernois Yard].

The 1969 Agreement further provides in Section VIII:

> This Agreement . . . shall supersede the provisions of any agreement with which it conflicts. . . .

BLE thus argues, and the district court apparently agreed, that 1969 Agreement's designation of Livernois Yard superseded the "conflicting" provision in the 1967 Agreement that gave Conrail the right to change on-off duty points.

---

**3.** In many cases under the Railway Labor Act, the party seeking to avoid federal court jurisdiction may discharge its burden by pointing to a single provision in the existing agreement that arguably justifies its unilateral action. *See International Bhd. of Firemen v. Consolidated Rail Corp.*, 560 F.Supp. 169, 174 (S.D.Ohio 1982). Since the instant case involves the interplay between multiple agreements, however, it is not governed by this rule of thumb. *Cf. International Longshoremen's Ass'n v. Toledo Lakefront Dock & Pellet Co.*, 776 F.2d 1341, 1344 (6th Cir.1985) (relationship between two agreements at issue). As will be seen below, Conrail argues that its actions were justified by a provision in the "1967 Agreement," while BLE essentially contends that this provision was superseded by the "1969 Agreement," which designated Livernois Yard as the on-off duty point. Properly viewed, therefore, the question for our review is

two-fold: first, whether the 1967 Agreement arguably justifies Conrail's unilateral change of the on-off duty point to North Yard; and second, whether Conrail provides an arguable basis to conclude that the 1969 Agreement did not supersede the 1967 Agreement.

**4.** BLE disputes this conclusion, arguing that the 1967 Agreement does not support Conrail's change of the on-off duty point for road engineers because the subject matter of the 1967 Agreement was work equity for yard employees. This contention is belied by .the express language of the provision, however, which specifically includes "Road . . . employees." It is at the very least arguable, therefore, that the 1967 Agreement gave Conrail the right to change on-off duty points for road engineers.

This interpretation of the agreements presents two problems. First, the two provisions are not necessarily conflicting. Although the 1969 Agreement states that the crews "will go on and off duty" at Livernois Yard, the circumstances surrounding the negotiation of this agreement suggest that this provision was not necessarily intended as a permanent designation of the on-off duty point. When the 1969 Agreement was negotiated, the parties were aware that the agreement would not be implemented immediately, but at some unknown time in the future if Conrail decided to establish the Detroit/Toledo pool. In view of the future-looking character of the Agreement, Conrail contends that the provision that crews "will go on and off duty" at Livernois Yard was merely an initial designation of the on-off duty point, which Conrail could then unilaterally change pursuant to its rights under the 1967 Agreement.

We conclude that Conrail's construction of the two agreements is not obviously insubstantial. Given the existence of the 1967 Agreement and the circumstances surrounding the negotiation of the 1969 Agreement, it is not unreasonable to argue that the designation of Livernois Yard as the on-off duty point was not intended to be permanent. Although the disputed provisions touch upon the same subject matter, nothing in the 1969 Agreement mandates the conclusion that the 1967 Agreement's grant of the right to change on-off duty points is no longer in effect.[5] *Cf. Toledo Lakefront,* 776 F.2d at 1343–44 (employer's reliance on earlier agreement is arguably justified when the later agreement did not expressly supersede the provision in the earlier agreement on which the employer relied). Under this view the two provisions are not in conflict, and the 1967 Agreement arguably authorizes Conrail to make unilateral changes in on-off duty points.

Even assuming for the purpose of discussion that the two provisions are in conflict, however, the district court's conclusion that the 1969 Agreement is "controlling" is assailable on a second ground: it disregards the limiting language in the 1981 letter through which Conrail implemented the 1969 Agreement. The 1969 Agreement by its terms did not go into effect until it was implemented by Conrail's letter to BLE.[6] The 1981 implementation letter stated:

> The conditions contained in the 1969 Agreement are subject to the provisions of the RRRA of 1973 and agreements made subsequent to March 19, 1969.

One subsequent agreement was the 1979 Blue Book, the master collective bargaining agreement. The 1979 Blue Book by its terms, however, had incorporated prior work equity agreements then in effect between Conrail and the union, including the 1967 Agreement.[7] Conrail thus argues that its right to change the on-off duty point, which was first granted by the 1967 Agreement, became part of the 1979 Blue Book and thereafter remained in effect. By implementing the 1969 Agreement "subject to" the 1979 Blue Book, the argument concludes, the designation of Livernois Yard as the on-off duty point for the Detroit/Toledo pool was made "subject to" Conrail's preexisting right to change the designation.

---

5. Our analysis diverges from the district court's at this juncture. In finding the 1969 Agreement controlling, the district court stated: "Contrary to Conrail's assertion, the court cannot find anything in the record ... upon which to conclude that the 1969 Agreement is no longer in effect." Regardless of whether the 1969 Agreement was "in effect," however, the question before the court was what effect the 1969 Agreement had on the grant of authority to Conrail in 1967 Agreement to unilaterally change on-off duty points. The court did not expressly address this question and thus failed to face directly whether Conrail's actions were arguably justified by the existing agreements.

6. Section VIII of the 1969 Agreement specifically stated that it would "be effective upon establishment of the [Detroit/Toledo] pool," which occurred in 1981.

7. The applicable 1979 Blue Book provision stated that "work equity arrangements ... shall *remain in effect ...*" (emphasis added). This language implies that the Blue Book incorporated only work equity agreements in effect in 1979, one of which was the 1967 Agreement. *But see supra* note 6 and accompanying text.

We again conclude that this interpretation of the agreements is not obviously insubstantial. The argument presents an intriguing question concerning to what extent BLE may be bound by Conrail's implementation letter when BLE failed to object to its terms at the time, a question the parties are free to pursue in arbitration. The federal court's task, however, is not to arbitrate the dispute, but to determine whether the challenged action was arguably justified under existing agreements. It is at the very least arguable that implementation of the 1969 Agreement had no effect on the 1967 Agreement's grant to Conrail of the right to change on-off duty points.[8]

Conrail finally relies on the 1982 Agreement to support its unilateral action. The "1982 Agreement" is a work allocation agreement that revamped work equity affecting Conrail road engineers, including those in the Detroit/Toledo pool. Section IV of the 1982 Agreement states:

> Equity provided by agreement or otherwise in effect prior to this Agreement are hereby superseded at the time of implementation of this agreement.

Conrail argues that the 1982 Agreement superseded the 1969 Agreement, thereby terminating the designation of Livernois Yard as the on-off duty point for the Detroit/Toledo pool. The meaning attributed to the 1982 Agreement, however, is self-defeating in the instant case. Conrail essentially contends that the 1982 Agreement superseded all prior work equity agreements affecting road engineers. Under this theory the 1982 Agreement would supersede not only the 1969 Agreement, but also the 1967 Agreement insofar as it applied to road engineers. Conrail's asserted contractual authority to change on-off duty points would accordingly be invalidated. The 1982 Agreement, therefore, does not arguably justify the challenged unilateral action.

■ Because we have already found alternative arguable bases under the existing agreements for Conrail's unilateral action, however, the infirmity of Conrail's final argument is inconsequential. Conrail's unilateral change of the on-off duty point in the Detroit/Toledo pool was arguably justified by the 1967 Agreement, as incorporated by the 1979 Blue Book. Therefore, this case presents a "minor" dispute under the Railway Labor Act.[9] Whether Conrail's interpretation of the agreements is correct will likely be decided through arbitration, assuming the parties are unable amicably to resolve the dispute. Since this is a minor dispute, however, Conrail is not compelled by statute to maintain the status quo. The district court's grant of injunctive relief, therefore, was erroneous, and the status quo injunction is accordingly vacated.[10]

## III. INJUNCTION BOND (NO. 86–1016)

In the consolidated appeal BLE challenges the district court order requiring a

---

8. Conrail also asserts that its unilateral action was authorized by section 706 of the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 797e (1982). Because we conclude that the unilateral change was arguably justified under the existing agreements, however, we need not address Conrail's statutory argument.

9. In an attempt to bolster its contention that Conrail's unilateral change in the on-off duty point was unlawful, BLE raises the historical argument that Livernois Yard had been the on-off duty point for Conrail and its predecessor railroads for over eighty years. There is no dispute in this case, however, that the location of the on-off duty point is a "working condition" that Conrail may change only in accordance with the Railway Labor Act. *Cf. Detroit & T.S. L. R.R. v. United Transp. Union,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). As required

under *Railway Carmen,* therefore, our inquiry focuses on whether Conrail's unilateral action was arguably justified by the existing collective bargaining agreements. BLE's historical argument sheds little light on this inquiry.

10. BLE presented evidence at the hearing before the district court tending to show that the road engineers were irreparably harmed by the change in the on-off duty point from Livernois Yard to North Yard. The district court's order was not premised on the existence of the traditional requirements in equity, however, so we do not address the propriety of an injunction against Conrail in such circumstances. *See United Transp. Union v. Burlington Northern, Inc.,* 458 F.2d 354, 357 (8th Cir.1972); *United Transp. Union v. Burlington Northern, Inc.,* 382 F.Supp. 896, 898 (D.Minn.1974); *cf. Locomotive Eng'rs,* 363 U.S. at 531 n. 3, 80 S.Ct. at 1329 n. 3.

$750,000 bond to secure the injunction. The purpose of an injunction bond is to provide "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed.R. Civ.P. 65(c). The federal courts of appeals have consistently held that the reversal on appeal of an injunction is tantamount to finding that the enjoined party was "wrongfully enjoined or restrained," and that such reversal triggers the wrongfully enjoined party's right to pursue recovery on the security bond. *See, e.g., Piambino v. Bailey,* 757 F.2d 1112, 1142–43 (11th Cir.1985) (injunction vacated in prior appeal), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986); *Coyne–Delaney Co. v. Capital Dev. Bd. of Ill.,* 717 F.2d 385 (7th Cir.1983) (same); *Buddy Systems, Inc. v. Exer–Genie, Inc.,* 545 F.2d 1164 (9th Cir.1976) (same), *cert. denied,* 431 U.S. 903, 97 S.Ct. 1694, 52 L.Ed.2d 387 (1977); *Atomic Oil Co. v. Bardahl Oil Co.,* 419 F.2d 1097, 1102 (10th Cir.1969) ("And generally, for the purpose of establishing liability on an injunction bond, a decree [by appellate court in prior appeal] dismissing a bill in equity constitutes a judicial determination that a temporary injunction should not have been granted."), *cert. denied,* 397 U.S. 1063, 90 S.Ct. 1500, 25 L.Ed.2d 685 (1970); *Northeast Airlines, Inc. v. Nationwide Charters and Conventions, Inc.,* 413 F.2d 335, 338 (1st Cir.1969) (appellate court's modification of overbroad injunction in prior appeal triggers liability on injunction bond for costs and damages arising from overbroad restraint); *see also Houghton v. Meyer,* 208 U.S. 149, 28 S.Ct. 234, 52 L.Ed. 432 (1908); *Carbone v. Meserve,* 645 F.2d 96, 97 n. 3 (1st Cir.) (reversal of injunction on appeal renders moot the bond issue when the injunction was stayed pending appeal), *cert. denied,* 454 U.S. 859, 102 S.Ct. 312, 70 L.Ed.2d 156 (1981); *cf. Aluminum Workers Int'l Union, Local No. 215 v. Consolidated Aluminum Corp.,* 696 F.2d 437 (6th Cir.1982) (reversing injunction under Norris–LaGuardia Act; remanding for a proper determination of amount of injunction bond and an action on the bond by the wrongfully enjoined party under a statute analogous to Rule 65(c)). Since we have concluded that the status quo injunction against Conrail was improvidently granted, Conrail may on remand move the district court to recover its costs and damages arising from the wrongful injunction, but only if the bond order was a valid exercise of the court's equitable powers.

BLE challenges the validity of the security bond on two grounds. First, it asserts that the district court is without power to order a bond securing a status quo injunction in a major dispute under the Railway Labor Act. Alternatively, BLE contends that ordering a $750,000 bond was an abuse of discretion. We do not agree that the district court lacked authority to require a bond, but do conclude that the exorbitant bond ordered in this case was an abuse of discretion.

We first consider BLE's proposition that the district court is without authority to impose a bond as security for a status quo injunction in a major dispute. BLE argues that since such an injunction may issue without regard for equitable constraints, the injunction is not an exercise of the court's traditional equitable powers, but is merely an order directing compliance with a status quo requirement in the Railway Labor Act. *See* 45 U.S.C. § 156 (1982). From these observations BLE deduces that the district court is without authority to exercise its ancillary equitable power to condition the injunction on the posting of security. We disagree.

A district court possesses the inherent equitable power to condition an injunction on certain undertakings, *see Brotherhood of Locomotive Eng'rs v. Missouri–K.–T. R.R.,* 363 U.S. 528, 531–32, 80 S.Ct. 1326, 1328–29, 4 L.Ed.2d 1379 (1960), including the posting of a security bond by the party seeking the injunction, *see Russell v. Farley,* 105 U.S. (15 Otto) 438–42, 26 L.Ed. 1060 (1882). In *Russell v. Farley,* the Supreme Court specifically declared that the equitable power to require security "is an inherent power of the court, exercised for the purpose of effecting justice

between the parties." *Id.* at 441. It is equally clear, on the other hand, that Congress possesses the authority to alter the courts' inherent equitable powers. *See Locomotive Eng'rs,* 363 U.S. at 532–34, 80 S.Ct. at 1329–30; *Holland v. Challen,* 110 U.S. 15, 24, 3 S.Ct. 495, 500, 28 L.Ed. 52 (1884) (equitable requirements may "be changed or dispensed with by the legislature without impairing the general authority of the court."). However,

> the comprehensiveness of … equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary or inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.

*Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946). Thus, "[u]nless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction." *Id.*

■ The Railway Labor Act does not expressly alter the federal courts' equitable powers. *Locomotive Eng'rs,* 363 U.S. at 532, 80 S.Ct. at 1329. As discussed above, the federal courts have nonetheless construed the Act to warrant status quo injunctions in major disputes without satisfying traditional equitable principles.[11] The evident theory underlying this position is that the severe nature and consequences attributed to major disputes, *see Elgin,* 325 U.S. at 723–24, 65 S.Ct. at 1289–90, the status quo provision in section 6, *see* 45 U.S.C. § 156, and the Act's overriding purpose of preventing interruptions in rail traffic, *see* 45 U.S.C. § 151a(1), combine to justify broadening the availability of injunctive relief in major disputes. These considerations and the resulting expansion of equitable jurisdiction, however, do not likewise compel the "necessary or inescapable inference," *Porter,* 328 U.S. at 398, 66 S.Ct. at 1089, that Congress intended to abrogate the courts' inherent equitable

power to require a bond as security for an injunction under the Act. Rather, because the Act increases the availability of injunctive relief, the courts' power to condition that relief becomes critical so that the courts may effectively discharge their duty "to ensure that extraordinary equitable remedies will not become the engines of injustice," *Locomotive Eng'rs,* 363 U.S. at 532, 80 S.Ct. at 1329. In the absence of a clear expression of Congress' intent to constrict the courts' equitable powers, therefore, we must conclude that the district courts retain their inherent power to condition an injunction under the Railway Labor Act on the posting of a security bond.

The district court came to the same conclusion and ordered BLE to post a $750,000 bond. The record does not disclose how the court arrived at this figure. The required security bond thus appears to be based on a 25% reduction of Conrail's $1 million request. Upon careful review of the evidence adduced at the hearing and submitted in support of Conrail's bond motion, however, we are constrained to conclude that the evidence before the district court was insufficient to justify a bond of the magnitude that the court ordered here.

We recognize, of course, that the amount of a security bond rests in the sound discretion of the district court. *See Roth v. Bank of Commonwealth,* 583 F.2d 527 (6th Cir.1978), *cert. dismissed,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979); *Urbain v. Knapp Mfg. Co.,* 217 F.2d 810, 815 (6th Cir.1954), *cert. denied,* 349 U.S. 930, 75 S.Ct. 772, 99 L.Ed. 1260 (1955). When ordering a bond to secure an injunction in a major dispute, however, the court's discretion is necessarily constrained by the purposes of the Railway Labor Act. *Cf. Locomotive Eng'rs,* 363 U.S. at 531–35, 80 S.Ct. at 1328–30 (upholding a condition attached to an injunction in a minor dispute because the condition served to preserve the dispute settlement process required by the Act). In considering a motion to require a security bond, therefore, the court should be sensitive not only to the enjoined party's need for security against financial loss, but

---

11. *See supra* note 1 and accompanying text.

also to the moving party's right to relief and the Act's goal of preventing unilateral actions in major disputes.

The extent to which the purposes of the security bond conflict with those of the Act will naturally vary from case to case depending upon the likelihood of injury to the enjoined party, the possible extent of the threatened loss, and the plaintiff's ability to post a bond. The potential for conflict is patent, however, in a case such as this one, in which the enjoined party asserts its need for security in excess of $1 million and the plaintiff likewise asserts its inability to meet such a requirement.[12] In such cases, the district court must carefully scrutinize the record to assure itself that the enjoined party's alleged financial peril is grounded in fact, not mere speculation, and that the resulting bond will not defeat the plaintiff's right to injunctive relief.[13] These determinations should be made on the basis of specific evidence in the record, with the required degree of specificity being dependent upon the availability of evidence and the exigencies of the case. Although the inquiry must involve some speculation, the necessity to speculate should substantially decrease when, as in the present case, the injunction and bond are ordered after an extensive evidentiary hearing. See 7 J. Moore, J. Lucas, & K. Sinclair, Moore's Federal Practice ¶ 65.09, at 65–94 to 65–95 (comparing bonds ordered to secure temporary restraining order with those securing preliminary injunction after evidentiary hearing). With these considerations in mind, we turn to more specific concerns and the evidence in this case.[14]

As a general matter, the district court will properly exercise its discretion if it requires security against increased administrative and operational costs arising from the injunction. The reported cases that mention injunction bonds under the Act support the inclusion of such out-of-pocket expenses in computing a security bond. See, e.g., Local 553, Transport Workers Union v. Eastern Air Lines, Inc., 544 F.Supp. 1315, 1336 (E.D.N.Y.) (requiring $10,000 bond, and providing that the amount may be increased as necessary, to secure additional salary expenses), modified on other grounds, 695 F.2d 668 (2d Cir.1982); Carbone v. Meserve, 498 F.Supp. 887 (D.Mass.1980) ($1,000 bond ordered), rev'd on other grounds, 645 F.2d 96 (1st Cir.), cert. denied, 454 U.S. 859, 102 S.Ct. 312, 70 L.Ed.2d 156 (1981). In the instant case, the evidence in support of Conrail's motion alleged that the return of the on-off duty point to Livernois Yard would cost the railroad $8,400 per year. BLE does not dispute this figure or assert that it would be unable to post such a bond. The district court, therefore, could properly require BLE to post a bond computed on the basis of Conrail's increased expenses. The bond would protect Conrail's threatened economic interests if it is later found to have been wrongfully enjoined, and the relatively slight amount of the bond would not frustrate BLE's right to injunctive relief. Accordingly, to the extent the bond in this case was based on Conrail's increased operational expenses, it was within the court's discretion.[15]

12. The bond order has not been satisfied because, according to BLE, the amount is unobtainable. The district court, however, denied Conrail's motion to vacate the injunction for failure to comply with the bond order.

13. Meaningful review of the district court's action would be enhanced, of course, if analysis of the relevant criteria were to be conducted on the record.

14. Although the nature of the evidence in this case requires that we address only the proofs presented in support of the bond motion, we note that a party seeking to defeat or limit a security bond would also be well-advised to detail its impecunity through specific evidence.

15. We do not mean to suggest, however, that the district court must order a bond as security for increased operational expenses that are adequately proved. Ordering an injunction bond is an exercise of the court's equitable powers and, as such, is subject to the court's usual equitable discretion. See 11 C. Wright & A. Miller, Federal Practice and Procedure § 2954, at 525–32 (1973). Thus, the court may order a bond that does not completely secure the enjoined party or the court may decline to order a bond, if necessary "for the purpose of effecting justice between the parties," Russell v. Farley, 105 U.S. (15 Otto) 433, 441, 26 L.Ed. 1060 (1882).

Increased operational expenses, however, account for only a small portion of the $750,000 bond that the lower court ordered. The remainder is attributable to Conrail's contention, presented through the testimony of Wayne C. Conn, Conrail's Regional Superintendent of Industrial Relations, that the injunction could result in extensive business losses for the railroad. The crux of Mr. Conn's testimony, at the hearing and by affidavit, was that returning the on-off duty point to Livernois Yard would cause outbound train delays to time-sensitive traffic at North Yard, which would in turn result in lost business of at least $19 million to $22 million per year. On this basis, Conrail requested a bond in excess of $1 million.

Initially, the factual basis for the projected amount of lost business is at best tenuous. Mr. Conn's affidavit presented two "examples" of business that Conrail would lose "if delays developed," one valued at $4.3 million per year, the other at $15 million to $18 million per year. These examples are not claimed to be exclusive, however, suggesting that the actual loss might be much higher. When juxtaposed with Conrail's request for "only" a $1 million bond, however, the reasonableness of the projections presented to the district court becomes questionable. This discrepancy implies that Conrail was exaggerating its need for security.

The primary deficiency in Conrail's request for security against lost business, however, was the absence of specific evidence supporting its claim that the status quo injunction placed the railroad in imminent financial peril. First, Conrail pointed to no instances in which it had lost business due to delays in transporting road crews from Livernois Yard to North Yard before the on-off duty point was changed. Such evidence would have gone far to support Conrail's anxiety over losing business due to operation of the injunction, yet the absence of the evidence likewise indicates that the fear of losing business may not have been well founded.

More importantly, the evidence advanced by Conrail to support its loss-of-business contention did not do the job. Mr. Conn's affidavit stated that "repeated" train delays would result in Conrail losing business, although the requisite frequency was not further defined. To be sure, Mr. Conn also stated that "there will be an increase in train delays" due to the injunction, but the record is unclear whether the alleged "increase" would cause the "repeated" train delays Mr. Conn claimed were necessary. Mr. Conn's testimony at the evidentiary hearing exacerbated this uncertainty; he stated that delays did not affect every train leaving North Yard, but that Conrail had such problems "on occasion." Finally, the premise of Conrail's asserted need for security was hotly contested by BLE's witnesses, who stated that location of the on-off duty point at Livernois Yard played a negligible role in train delays at North Yard.

Against the backdrop of Mr. Conn's ambiguous and contradicted assertions, we are again struck by the evidence that was not introduced. Conrail presented no historical data, either at the hearing or in support of its bond motion, to support its assertion that locating the on-off duty point at Livernois Yard would cause repeated outbound train delays. The testimony of Conrail employees, however, indicated that the railroad maintained exhaustive records detailing the efficiency of the train system. These reports were prepared on a daily, and sometimes a thrice-daily basis. Conrail had recently made the decision to change the on-off duty point, ostensibly on the ground of decreasing outbound delays. It is quite surprising, therefore, that the railroad did not introduce specific evidence concerning the frequency of such delays in the past. Such evidence would have given BLE a tangible fact to dispute—as opposed to the union's witnesses vaguely asserting that there was no delay problem, much as Mr. Conn opined that the problem did exist—and it would have provided the district court with a solid factual basis on which to order the requested security. Similarly, the court was presented with little evidence supporting Conrail's assertion that any alleged delays were caused by locating the on-off duty point at Livernois Yard. With-

out such evidence, the ambiguity surrounding Mr. Conn's unsupported and contradicted conclusions left the court merely to speculate as to the likelihood of any loss of business resulting from the injunction, as well as to the amount.

As we have stated, the need for specific evidence will necessarily vary depending on the extent of disputed facts and the availability of the evidence. The dispute in the instant case went to the heart of Conrail's alleged threatened losses, and all indications were that supporting—or contradicting—evidence should have been readily available in Conrail's business records. In such circumstances, the failure to produce the evidence must weigh against Conrail's request for a bond. Accordingly, we hold that ordering a $750,000 bond to secure the injunction in this case was an abuse of discretion.

Moreover, even if we were disposed to uncritically accept Mr. Conn's assertions concerning the likelihood and amount of potential business losses, we would reverse the security bond on an independent ground. Before requiring a bond to secure the enjoined party against loss of business, we believe it is incumbent on the parties and the court to investigate alternative, less costly methods of avoiding the threatened losses. Considering avenues to mitigate the potential loss is a logical extension of the process of balancing the enjoined party's financial plight with the plaintiff's right to injunctive relief. Any increase in expenses foisted on the enjoined party as a result of mitigating future losses would of course be includable in the injunction bond as an increased operating expense. *Cf. Eastern Air Lines*, 544 F.Supp. at 1336 (against claim that injunction would force airline to break foreign laws, court ordered bond to secure airline against increased salary expenses that would result from compliance with both foreign laws and the injunction). This requirement should not be overly burdensome. In the instant case, for example, the parties should have been able to devise a plan which, although it might increase operating expenses, would substantially reduce the possibility of delays that Conrail fears. This observation is not based on conjecture, but is derived from Conrail's appellate brief. While lamenting BLE's failure to post the required bond, Conrail states that it "has taken all possible measures to avoid losses." The brief does not delineate what measures were taken or what costs were incurred as a result, but the fact that mitigation was evidently possible indicates persuasively that a $750,000 bond was not necessary. We hold that the failure to consider mitigating the possibility of lost business before setting an extravagant injunction bond on that basis was an abuse of discretion.[16]

For the foregoing reasons, we VACATE the status quo injunction, and we VACATE the security bond except insofar as it is premised on Conrail's increased operating expenses. The case is REMANDED to the district court for proceedings consistent with this opinion.

RYAN, Circuit Judge (dissenting).

I agree that the trial court erred in granting injunctive relief in this case because the parties were engaged in a "minor" dispute within the meaning of the Railway Labor Act. Therefore, the disagreement should have been arbitrated.

But I must respectfully dissent from my brothers' conclusion that the trial court abused its discretion in setting the bond to secure the injunction in the amount of $750,000. I would not reach this issue, and I believe the court should not have done so.

The district court ordered the appellant, Division No. 1, Detroit Brotherhood of Lo-

---

**16.** If Conrail on remand moves the district court to recover costs and damages in excess of amounts related to its increased administrative costs, the court will find it necessary to recompute the amount of the bond. *Cf. Aluminum Workers Int'l Union, Local No. 215 v. Consolidated Aluminum Corp.*, 696 F.2d 437 (6th Cir.1982). In doing so, it would be within the court's discretion to reopen the record to give Conrail the opportunity to cure the deficiencies in proof that we have pointed out. Alternatively, the court might wish to base the new bond figure on reasonable costs Conrail has incurred in mitigating its damages. This decision is not intended to foreclose either of these options.

comotive Engineers, to post a bond in the amount of $750,000 to secure the appellee Consolidated Rail Corporation against losses it may suffer in the event the trial court's injunction is found to have been wrongly entered. The union asked to be relieved of the burden of posting the bond and the trial court, after carefully considering the arguments pro and con, denied the union's request and directed that the bond be posted as ordered.

The union solved its problem by simply disobeying the trial court's order and refusing to post the bond, claiming inability to do so, but offering no evidence whatsoever of such claimed inability and never requesting a trial court factual determination of its inability.

Despite the union's refusal to obey the court's order to post the bond, the court, in disregard of Fed.R.Civ.P. 65(c),[1] denied the railroad's motion to stay issuance of the injunction pending the union's compliance with the court's bond order.

Having decided, in the exercise of its discretion, to require the union to post a bond as mandated by Rule 65(c), the district court was not free to issue its injunction until the security was posted.

Although it is settled that security need not be posted at the time interlocutory injunctive relief is applied for, the rule is phrased in mandatory terms and the conclusion seems inescapable that once the court decided to grant equitable relief under Rule 65 it must require security from the applicant. In fact, a district court's failure to require the posting of a bond or other security has been held reversible error.

The mandatory nature of the security requirement is ameliorated by the remaining portion of the first sentence of Rule 65(c), which states that the security required shall be "in such sum as the court deems proper, for the payment of such costs and damages as may be in-

curred or suffered by any party who is found to have been wrongfully enjoined or restrained...."

11 Wright & Miller, § 2954 at 524–25 (1973) (footnotes omitted).

Thus, the union had its cake and ate it as well. It got the injunction we now hold it was not entitled to, and did not post the bond it was ordered to post. Then, with remarkable temerity, the union filed an appeal in this court seeking the court's aid to relieve it from its obligation to post the bond it has refused to post and plainly has no intention of posting. In my judgment, the union is utterly without equitable standing to pray this court for relief. Why the appellee railroad has not sought dismissal of the union's appeal on the bond issue, or requested that it be made to show cause why it should not be held in contempt for disobeying the district court's order, is not clear. Conceivably, the railroad is more interested in the long run benefit of a correct reported appellate determination that the injunction it has been ordered to obey was improperly entered. Whatever the railroad's motive for doing nothing about the union's disobedience of the court's order, this court is duty bound to reject the union's plea for relief because it is without standing in equity to pray for appellate relief from an order it has refused to obey, which has not been stayed, and which, given the improper issuance of the injunction against the railroad, has made a mockery of the district court's order and may have worked a substantial injustice upon the railroad.

I would dismiss the union's appeal with costs.

---

**1.** Fed.R.Civ.P. 65(c) provides:
 No restraining order or preliminary injunction shall issue except *upon the giving of security* by the applicant, *in such sum as the court deems proper,* for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof. (Emphasis added.)