Air Line Pilots v. Guilford Transp.   CV-04-331-JD  09/17/04  P

**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF NEW HAMPSHIRE**


Air Line Pilots Association,
International

    v.                                   Civil No. 04-331-JD
                                          Opinion No. 2004 DNH 139
Guilford Transportation Industries,
Inc., Pan American Airways Corp.,
Boston-Main Airways Corp.


## REPORT AND RECOMMENDATION


Before the Court for consideration is the motion filed by

Air Line Pilots Association, International ("ALPA") for a

preliminary injunction under the Railway Labor Act ("RLA"),

codified at 45 U.S.C. § 151 et seq., to restrain defendants

Guilford Transportation Industries, Inc. ("Guilford"), Pan

American Airways Corp. ("Pan Am") and Boston-Maine Airways Corp.

("Boston-Maine") (collectively "the Guilford defendants") from

violating the statutory rights of Pan Am's flight crewmembers

("pilots") and their union, ALPA, under 45 U.S.C. § 152 First,

Second, Third, Fourth, Seventh and Eighth and 45 U.S.C. § 156.

The defendants filed an objection.

This matter was referred to me to review the request for

injunctive relief, to conduct any hearing the Court might set,

and to file proposed findings and recommendations. The Court held an evidentiary hearing on September 9 and 10, 2004. For the reasons set forth below, the Court recommends that the request for a preliminary injunction be granted.

Standard of Review

"The policy of the Railway Labor Act was to encourage use of the nonjudicial processes of negotiation, mediation and arbitration for the adjustment of labor disputes." Bhd. of R.R. Trainmen, Enter. Lodge, No. 27 v. Toledo, P. & W. R.R., 321 U.S. 50, 58 (1944). Federal district courts do not have jurisdiction to rule on the merits of labor disputes under the RLA. Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. ("Springfield Terminal"), 210 F.3d 18, 23 (1st Cir. 2000). The court only decides what type of dispute resolution procedure applies based on the category into which the dispute fits. Id. (citing Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 722-23 (1945)).

A threshold issue that must be determined is whether a controversy should be characterized as a "minor" or "major" dispute. Consolid. Rail Corp. v. Ry. Labor Executives' Ass'n ("Conrail"), 491 U.S. 299, 302 (1989). In sum, "major disputes seek to create contractual rights, minor disputes to enforce

2

them." Id. (citing Elgin, 325 U.S. at 723).

The RLA bars a carrier from implementing a contested change in a major dispute until mediation efforts are exhausted. Springfield Terminal, 210 F.3d at 24 (citing Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union ("Shore Line"), 396 U.S. 142, 150-53 (1969)). However, if the employer claims that the parties' agreement gives it the right to make a contested change, "and if the claim is arguably justified by the terms of the parties' agreement (i.e., the claim is neither obviously insubstantial or frivolous, nor made in bad faith)," the employer may make the change and the courts must defer to the jurisdiction of arbitrators to decide the dispute. Conrail, 491 U.S. at 310; see also, Springfield Terminal, 210 F.3d at 33 (to show that only a minor dispute is at issue, a carrier need only show that its contractual term defense is not "totally implausible"). In considering whether the carrier's actions are arguably justified by the agreement, the court considers express and implied terms, as well as the parties' "practice, usage and custom." Conrail, 491 U.S. at 311 (quoting Transp. Union v. Union Pac. R. Co., 385 U.S. 157, 161 (1966)).

If the circumstances so warrant, a court may issue an

injunction ordering the parties to maintain the pre-dispute status quo during the dispute resolution procedures mandated under the RLA. Springfield Terminal, 210 F.3d at 33 (citing Conrail, 491 U.S. at 303 (1989)).

Background

I. Stipulated Facts

Pan Am entered into a collective bargaining agreement ("CBA") with ALPA that became effective on November 15, 1999, remains in effect now, and does not become amendable until November 15, 2005. Neither party gave the other notice of a desire to amend the CBA prior to the amendable date.

Neither Guilford, nor Boston-Maine are parties to the ALPA-Pan Am CBA, and have entered into no agreement with ALPA. The pilots of Boston-Maine are not represented for the purposes of collective bargaining by an exclusive bargaining agent.

Pan Am performs regular, scheduled passenger service in the eastern United States and Puerto Rico and operates charters, with a fleet of six Boeing 727 aircraft configured to seat 149 passengers. Since it received certification from the Department of Transportation ("DOT") in 1999, Pan Am has had authority to operate up to eight 727 aircraft. Pan Am currently employs

4

approximately 30 pilots.  Twenty-one Pan Am pilots are active ALPA members.[1]

Boston-Maine applied to the DOT for authority to fly 727 aircraft for interstate, scheduled passenger service on August 27, 2002.  ALPA has been aware of Boston-Maine's planned 727 operations since that date and has vigorously opposed DOT certification of Boston-Maine's planned 727 operation.

After requesting and receiving oral permission on July 16, 2004 from the DOT, and operational permission from the Federal Aviation Administration ("FAA"), to operate 727 aircraft, Boston-Maine began to operate 727 aircraft in August 2004 in interstate service, despite ALPA's vigorous opposition.

Prior to receiving authorization by the DOT to fly 727 aircraft in July 2004, Boston-Maine performed scheduled passenger service with a fleet of ten Jetstream 3100 turboprop aircraft, seating 19 passengers, among other aircraft, and cargo service utilizing two CASA-212 turboprop aircraft.  Boston-Maine still

---

[1]Matthew J. Kernan, a commercial airline pilot employed as a Captain with Piedmont Airlines, and ALPA's Resource Coordinator, testified that he has been appointed as the Custodian Representative for the Pan Am pilot group.  Kernan testified that in his capacity as Custodian Representative he administers grievances under the Pan Am-ALPA CBA.  Kernan also testified that ALPA has been unable to get any Pan Am crewmembers to take on ALPA leadership positions because they fear reprisals by Pan Am.

operates both the Jetstream and CASA aircraft.  Boston-Maine is currently hiring and training 727 pilots.

Guilford is the lessor of the six B-727 aircraft operated by Pan Am and the single B-727 aircraft operated by Boston-Maine.

II.  Additional Facts

Pan American Airlines, Inc. ("Pan Am Inc."), not named as a defendant in this lawsuit, is the owner of Pan Am and Boston-Maine.  Pan Am Inc. acquired the assets of Pan Am (formerly known as Carnival Airlines) out of bankruptcy in June 1998 under a Plan of Reorganization approved by the United States Bankruptcy Court for the Southern District of Florida.  Boston-Maine, a New Hampshire corporation, was formed as a wholly-owned subsidiary of Pan Am Inc. in March 1999.  Neither party has produced evidence identifying the ownership of Pan Am Inc.

John Nadolny, defendants' principal witness, testified that Guilford has no ownership interest in either Pan Am or Boston-Maine.[2]  Nadolny further testified that Guilford does not direct the operations of those companies.[3]

_____

[2]The parties stipulated that John Nadolny is the General Counsel for Guilford, Pan Am and Boston-Maine.

[3]ALPA alleges that there is a close interrelationship between Pan Am, Boston-Maine and Guilford.  See Mem. of Points and Authorities In Support of Pl.'s Mot. at 5 and n.1.  As

6

Nadolny testified that Pan Am has lost money ever since it resumed operating out of bankruptcy. The evidence showed that Pan Am once ceased operating for just under 30 days. While Pan Am formerly employed as many as 90 pilots, following a furlough in the fall of 2002 the Pan Am pilot ranks were reduced to 30. Nadolny testified that Pan Am notified the FAA in June 2004 that it intended to cease operations no later than October 31, 2004.

Nadolny testified that the Boston-Maine operation was started from scratch. He testified that Boston-Maine employs personnel separate from Pan Am in the titles of Director of Operations, Director of Maintenance, Director of Quality Assurance, Director of Safety, and Chief Pilot. He testified that, pursuant to law, Boston-Maine has received a certificate for each aircraft it operates and that Boston-Maine pilots do not fly Pan Am certified aircraft in revenue-producing airline service. He further testified that Boston-Maine's operating specifications, procedures and manual are distinct from those of

_____

support for this assertion, ALPA relied in large part upon the Declaration of Robert E. Barnes, a former Pan Am Vice President who is now employed by the FAA. Citing health problems on the morning of September 9, 2004, Barnes did not appear to testify. The Court granted ALPA leave to take Barnes' deposition, and to submit the transcript as evidence, but ALPA declined. The Court does not consider Barnes' declaration as evidence supporting ALPA's request for injunctive relief.

7

Pan Am. In addition, Boston-Maine operates its own flight dispatching and tracking facilities, maintenance facilities, inventory storage facilities, quality assurance programs, training programs, record keeping, financial accounts, vendor accounts, U.S. Customs bonds, and contractual arrangements.

Like Pan Am, Boston-Maine has never been profitable. However, the evidence shows that Boston-Maine's operations have expanded while Pan Am's have contracted. In documents that Boston-Maine submitted to the DOT requesting amended certificates of authority, Boston-Maine identified a number of former Pan Am employees who now work for Boston-Maine, including some who have assumed management positions at Boston-Maine. See Fawbush Decl., Exs. 4, 10 and 11.

The evidence shows that Pan Am and Boston-Maine entered into a support services and facilities agreement in October 2001, and that Boston-Maine uses Pan Am personnel to train its employees. Among the Pan Am employees who have trained Boston-Maine employees is Linda Toth, formerly employed by Pan Am as Southern Regional Manager. Toth testified that she conducted stations training.[4]

_____

[4]Linda Toth's employment was terminated in June 2004. Toth testified that she was ordered by Stacy Beck, Director of

8

Toth testified that during the course of her employment with Pan Am she spoke with David Fink frequently.[5] Toth testified that Fink talked about ALPA all the time, and that he greatly disliked the organization. Toth testified that in March or April 2004 Fink told her, among other things, that "it was going to be smooth sailing with Boston-Maine" after they got rid of "the union jackasses," and that within six months all of the planes would be on the Boston-Maine certificate.

ALPA introduced a memorandum on Pan Am stationary to Pan Am flight attendants dated June 1, 2004 encouraging them to send their resumes to Boston-Maine. Pl. Ex. 7. That memorandum states in relevant part:

Stations for Pan Am and Boston-Maine, to certify that certain Boston-Maine employees had received ramp training that Toth testified she was not certified to provide. Toth testified that she was subsequently terminated for falsifying documents.

Stacy Beck testified that Toth was certified to provide Boston-Maine ramp training and that Toth lied about having conducted the training and falsified documents. Beck testified that she did not order Toth to falsify documents, and that she terminated Toth's employment after conducting an audit that revealed that the training in question had not been completed.

Having listened to the testimony of the witnesses, and reviewed the exhibits, the Court finds Toth's testimony that she did not believe that she was certified to perform Boston-Maine ramp training, and that she was ordered to sign documents indicating that she had performed the training, to be credible.

[5]The parties stipulated that David Fink is the President of Guilford, Pan Am and Boston-Maine.

9

> If you have an interest in applying for a Flight
> Attendant position with Boston-Maine Airways, now is
> the time to get your resume tuned up . . . . If you
> have been doing a very good job at Pan Am then Boston-
> Maine Airways is interested in considering you for this
> new airline.  It's a different company so you will be
> starting over, so to speak.  This is where the company
> (Guilford) is headed so give it serious consideration.

Id. at 2.

Pan Am Captain Norman Schott and First Officer Kevin Black both testified that the amount of hours that they have been offered to fly each month has been reduced from approximately 80 hours per month to approximately 50 to 60 hours per month since Boston-Maine started its 727 operation.  Schott testified to a specific instance when he lost scheduled passenger flying assignments to Boston-Maine.  Schott testified that he checked in with Pan Am's crews scheduling department for flying that he was to do on August 5, 2004 and was told that the last two legs of the assignment he was supposed to have flown would be done instead by Boston-Maine.  Schott further testified that when he telephoned the scheduling department to inquire about a revision to the September bid package[6] that reduced the amount of flying he could perform from about 80 hours per month to between 50 and

_____

[6]The bid package is the means through which Pan Am pilots express their preference for work assignments.

60 hours he was told that marketing made a last minute decision to give the Santa Domingo line to Boston-Maine. Schott further testified that he discovered a pop-up advertisement displayed on Pan Am's website offering first class and coach seats for flights between San Juan and Santo Domingo. See Pl.'s Ex. 4. Schott concluded that this work was going to be given to Boston-Maine because Pan Am does not operate any 727 aircraft configured for first class service, but Boston-Maine does.[7]

The evidence shows that Pan Am and Boston-Maine operate a joint reservation system that may be accessed from either the Pan Am or Boston-Maine websites. In addition, a route map on the Boston-Maine website shows both Pan Am and Boston-Maine service. Nadolny testified that Boston-Maine intends to operate the same service that is currently being offered by Pan Am after Pan Am's operations are discontinued.

### Discussion

ALPA argues that injunctive relief is warranted because the defendants are engaged in an alter-ego work diversion scheme that will result in the complete and final shutdown of Pan Am and the

---

[7]The Court does not find credible Nadolny's testimony that the pop-up ad reflected in Plaintiff's Exhibit 4 was just an experiment by the IT department that only appeared on Pan Am's website one day.

11

discard of ALPA. ALPA argues that the defendants intend to permanently replace Pan Am's operations, which are unionized, with the non-union Boston-Maine operation controlled by the defendants.

Defendants dispute ALPA's claim that Pan Am has been engaged in unlawful work diversion. Defendants argue that Pan Am has on occasion subcontracted work to other airlines, including Boston-Maine, in accordance with the CBA, but that this was only in instances where there have been maintenance or crew shortage problems that arose on a particular day. Defendants contend that the issues presented in this action pertain to a "minor" dispute within the meaning of the RLA because it involves an interpretation of the scope of work provisions of the CBA. Therefore, defendants argue, this dispute is subject to arbitration under the RLA, and the federal courts lack jurisdiction to hear the parties' dispute.

I. Whether the Controversy at Issue is a Major Dispute

A. Status Quo Provisions of the RLA

The RLA provides that:

It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all

disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152 First. The RLA further provides that:

No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

45 U.S.C. § 152 Seventh. Section 6 of the RLA requires that employers and employee representatives "shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules or working conditions . . . ." 45 U.S.C. § 156. RLA Section 2, First and Seventh, and Section 6, the so-called "status quo" provisions, prohibit unilateral changes in wages or working conditions where there is a preexisting collective bargaining agreement. Atlas Air, Inc. v. Air Line Pilots Ass'n, 232 F.3d 218, 223 (D.C. Cir. 2000).

B.    Work Diversion Claim

Federal courts, including the First Circuit, have held that "[t]he RLA is defeated if a carrier uses a related corporation to alter the status quo." Springfield Terminal, 210 F.3d at 28. Indeed, the First Circuit found that "[t]he mere 'prospect of

13

having work shifted to a replacement subsidiary would constitute a change in the working conditions and practices' sufficient to trigger a major dispute." Id. at 33 (quoting Air Line Pilots Ass'n, Int'l v. Transamerica Airlines, Inc. ("Transamerica Airlines"), 817 F.2d 510, 516 (9th Cir. 1987)). See also Burlington N. R.R. Co. v. United Transp. Union, 862 F.2d 1266, 1275 (7th Cir. 1988) (a carrier cannot evade its duties under a collective bargaining agreement or the RLA by directing business to an entity within the same corporate family and not obligated by the existing collective bargaining agreement); Transamerica Airlines, 817 F.2d at 515 (federal courts have jurisdiction to hear a dispute in which an employer is alleged to have established a non-union replacement subsidiary in order to transfer to that non-union subsidiary work being performed by an existing subsidiary that is bound by a collective bargaining agreement).

In determining whether a carrier is using a related corporation to alter the status quo, a court must look beyond corporate formalities if the nominally independent corporation is serving as the alter ego of the carrier. Springfield Terminal, 210 F.3d at 28. Veil piercing under the RLA may apply to

14

separate corporations within the same corporate family and is not limited to wholly-owned subsidiaries of the carrier. Id. at 29.

The mere existence of common ownership, by itself, is insufficient to pierce the corporate veil. Id.

> The record must include evidence that the carrier used the related corporation for the purpose of evading the collective bargaining agreement and the status quo requirements of the RLA. In making this determination, no single factor is dispositive. The district court may consider the chronology of events: if the carrier only transferred work to the related corporation after unsuccessful union negotiations, that fact may suggest that the carrier shifted the work in an effort to avoid the RLA status quo provisions.

Id. (citations omitted). The First Circuit emphasized that a plaintiff is not required to show that the related corporation is a sham business or that it was created or operated primarily to defeat the RLA in order to demonstrate that the corporate veil should be pierced. Id. at 30. That is because the function of veil piercing in the RLA context is not to determine liability as in tort or contract cases. Id. Rather, "in the RLA major dispute proceedings, veil piercing operates only to block the related corporation from assisting the carrier in altering the collective bargaining agreement before mediation procedures are exhausted." Id. In this regard, "RLA veil piercing is similar to the well-established practice of extending the scope of an

15

injunction to include non-parties acting in concert with parties to defeat the injunction's purpose."  Id.

In the instant case, ALPA argues that the defendants have engaged in a work diversion scheme taking existing Pan Am work and diverting it to non-union Boston-Maine, which defendants created and control.  The result, according to ALPA, has been a decrease in the amount of flying performed by Pan Am and its unionized employees.

The evidence supports a finding that the defendants have used Boston-Maine to circumvent the collective bargaining agreement.  Pan Am and Boston-Maine are part of the same corporate family.  The aircraft flown by both companies are leased by Guilford.  Defendants have stipulated that at least three senior corporate officers of Pan Am, Boston-Maine and Guilford are the same.[8]  In addition, Stacy Beck testified that she is the Director of Stations for both Pan Am and Boston-Maine.

The evidence shows that the Boston-Maine operation was built from scratch when Pan Am already had a certified 727 airline with trained and experienced 727 pilots.  The defendants have not

---

[8]In addition to the multiple positions held by Fink and Nadolny, the parties stipulated that Eric Lawler is the Chief Financial Officer for Guilford, Pan Am and Boston-Maine.

cited any legitimate business purpose for starting a duplicate 727 operation at Pan Am's non-union affiliate, Boston-Maine, following losses and a major furlough at Pan Am.

The evidence further shows that in the course of expanding the non-union Boston-Maine operation, Boston-Maine has taken on a number of former Pan Am employees including some who have taken on management positions. The evidence further shows that Pan Am employees have been used to train Boston-Maine employees while the defendants planned to shut down Pan Am.

The Court credits Linda Toth's testimony that David Fink, President of Guilford, Pan Am and Boston-Maine, told her in March or April 2004 that "it was going to be smooth sailing with Boston-Maine" after they got rid of "the union jackasses," and that within six months all of the planes would be on the Boston-Maine certificate. Although it is not necessary to the Court's result, these comments support ALPA's claim that the defendants have planned to transfer Pan Am's work to an affiliated non-union operation that they control. The June 2004 Pan Am memorandum to its flight attendants encouraging them to apply to Boston-Maine because that is where Guilford is headed further supports the conclusion that the defendants are acting in concert to divert

17

work traditionally performed by unionized Pan Am to non-union Boston-Maine.

The defendants argue that Boston-Maine has existed in parallel with Pan Am throughout the duration of the CBA, and that the CBA does not preclude Pan Am from subcontracting work to an affiliated airline. However, this argument overlooks that Boston-Maine did not operate 727 service similar to that offered by Pan Am when the CBA was negotiated. As ALPA argues, Boston-Maine's small aircraft operation could be viewed as merely complementary to Pan Am's 727 service.

The Court is unpersuaded by the defendants' argument that ALPA is using this lawsuit in an attempt to obtain rights that it bargained away. The evidence at the hearing showed that prior to the execution of the CBA, ALPA proposed that the Recognition and Scope Section expressly provide that "[Pan Am] will not create or acquire an 'alter ego' to avoid the terms and conditions of the Agreement." See Dfs.' Ex. A, Sec. 1, Para. B, No. 5. Pan Am rejected that suggestion and the executed CBA does not contain that language.[9] Defendants argue that ALPA's work diversion

_____

[9]For purposes of the instant dispute, the CBA provides in relevant part:

SECTION 1. RECOGNITION AND SCOPE

18

claim requires an examination of the parties' bargaining history and an interpretation of the Scope of Work provision of the CBA, which defendants contend requires that this dispute be resolved in arbitration.

ALPA argues that the cited language from its draft of the CBA merely sought the addition of an added layer of protection. ALPA analogizes this to collective bargaining agreements that include language stating the employer will not engage in unlawful discriminatory practices not withstanding that employees have constitutional and statutory protection against unlawful

---

\* \* \*

B.    Scope

    1.    Except as provided in subsection 1.B.2, all flying by and for the service of the Company on aircraft owned or leased by and for the Company and utilizing the authority granted under the Company's operating certificate shall be conducted (a) in accordance with the Pan American Airways Corp. operating certificate, (b) by pilots whose names appear on the Pilots' System Seniority List.  Chartered flying by and for the Company shall not be on a regular or scheduled basis.

    2.    Notwithstanding subsection 1.B.1. above, the Company may enter into aircraft interchange agreements with other carriers if such interchange agreements tod not result in the furlough of any of the Company's pilots.

Pl.'s Ex. 1.

discrimination. ALPA argues that it did not give up its statutory rights to protection from attempts to divert work to a non-unionized affiliated entity within Pan Am's corporate family.

The Court agrees with ALPA that the defendants have not demonstrated that ALPA bargained away its statutory rights in negotiating the CBA. Viewed conversely, the Court finds it totally implausible that ALPA would agree to a provision in the CBA stating that Pan Am could "create or acquire an alter ego to avoid the terms and conditions of the Agreement." The consequences of such a provision would clearly undermine the CBA and would be contrary to law. See Ry. Labor Executives' Ass'n v. Boston & Maine Corp., 808 F.2d 150, 158 (1st Cir. 1986) (finding that a provision in a collective bargaining agreement providing that an employer could abolish employee positions in retaliation for employees engaging in activities protected by the RLA would be clearly invalid as contrary to law); see also Ruby v. TACA Int'l Airlines, 439 F.2d 1359, 1364 (5th Cir. 1971) (finding that a collective bargaining agreement could not reasonably be read to authorize a full-scale unilateral transfer with the attendant consequences for ALPA and the agreement as a whole). The Court finds obviously insubstantial defendants' argument that ALPA's

20

willingness to execute the CBA without its requested language makes it arguable that ALPA agreed that Pan Am could transfer its work to an affiliated non-union entity.

Defendants argue that Springfield Terminal, and other cases relied upon by ALPA, are distinguishable in that to the extent that the service being operated by Boston-Maine could be deemed by the court to be a transfer of work from Pan Am to Boston-Maine, these transfers did not follow unsuccessful negotiations with the union. The Court finds that this distinction should affect the result here. That the defendants chose not to attempt to bargain with ALPA prior to starting a 727 operation at Boston-Maine does not support the conclusion that ALPA agreed to Pan Am transferring work traditionally performed by Pan Am to an affiliated non-union entity.

The Court further finds unpersuasive defendants' argument that ALPA could have arbitrated its work diversion claim two years ago when Boston-Maine first sought authority to fly 727 aircraft. ALPA's claim is that Pan Am and Boston-Maine are being controlled by Guilford, and that Pan Am Inc. is merely an intermediary shell entity. Any arbitration award that ALPA could have obtained against Pan Am would have no binding affect on

21

Guilford, Boston-Maine, or Pan Am Inc. because they are not parties to the agreement.

Based on the Court's reading of <u>Springfield Terminal</u>, and the other cases cited herein, the Court finds that ALPA has demonstrated that a preliminary injunction is warranted to enjoin the defendants from violating the status quo provisions of the RLA by diverting work from Pan Am to Boston-Maine pending completion of the mandated mediation procedures.

C.    <u>Interference With Organizational Rights Claim</u>

"RLA bars employers from engaging in discriminatory actions designed to impede or inhibit employees' exercise of their right to organize for collective bargaining purposes." <u>Atlas Air</u>, 232 F.3d at 224. Section 2 of the RLA, Third, provides that employees may select their representatives "without interference, influence, or coercion" of "any" kind. 45 U.S.C. § 152 Third. Section 2, Fourth, further provides that:

> No carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees . . . or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization.

22

45 U.S.C. § 152 Fourth.

ALPA argues that the defendants' conduct described herein, in addition to violating the status quo provisions, violates the pilots' rights to organize and be represented by a union.  In considering RLA claims under § 2, Third and Fourth, "'the real question' . . . is whether the carrier has discriminated against its employees because they have engaged in activities protected by the RLA."  Atlas Air, 232 F.3d at 224.  In making this determination, the Court should consider whether the carrier's conduct had a legitimate business motivation independent of any effort to discourage employees from exercising their rights under the RLA.  Id.

Justiciable claims under RLA § 2, Third and Fourth, are more limited than claims brought under the status quo provisions of the RLA.  See Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists & Aerospace Workers, 915 F.2d 43, 53 (1st Cir. 1990).  The Supreme Court has long held that the provisions of 45 U.S.C. § 152, Third and Fourth, "address primarily the 'precertification rights and freedoms of unorganized employees.'"  Id. at 51 (quoting Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants, 489 U.S. 426, 440 (1989)).  Where the union has

23

already been certified, a union's permissible claims under § 2, Third and Fourth, are narrowly circumscribed. The First Circuit has found that judicial intervention in such cases is limited to the following circumstances: (1) where the employer's conduct has been motivated by anti-union animus or an attempt to interfere with its employees' choice of their collective bargaining representative; or (2) the employer's conduct constitutes discrimination or coercion against that representative; or (3) the employer's conduct involves acts of intimidation that cannot be remedied by administrative means; or (4) the employer engaged in a fundamental attack on the collective bargaining process or a direct attempt to destroy a union. Id. (citing cases).

In the Court's view, ALPA's claim that the defendants are engaged in a scheme to shut down unionized Pan Am, and intentionally eliminate ALPA in the process, involves a direct attempt to destroy a union. ALPA's claim is supported by the evidence discussed above, including that: (1) the defendants cited no legitimate business purpose for starting a 727 operation at Boston-Maine, (2) the defendants have already diverted regularly scheduled Pan Am work to Boston-Maine, (3) the defendants intend for Boston-Maine to continue flying the routes

24

now being flown by Pan Am, (4) Fink, the President of Guilford, Pan Am and Boston-Maine has stated his desire to shut down Pan Am and place all of the aircraft currently flown by Pan Am under the Boston-Maine certificate, and (5) Fink has expressed specific anti-union animus and his anticipation of a "smooth" non-union operation.

Since the Court finds that the evidence support's ALPA's claim that the defendants have engaged in a direct attempt to destroy the union, the Court further finds that ALPA's request for injunctive relief is supported by RLA § 2, Third and Fourth.

## II. Irreparable Injury

In a case decided under the RLA, the Supreme Court found that "district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury." Conrail, 491 U.S. at 303 (citing Shore Line and Division No. 1, Detroit, Bhd. of Locomotive Eng'rs v. Consol. Rail Corp., 844 F.2d 1218 (6th Cir. 1988)). In Conrail, the Supreme Court noted parenthetically that a status quo injunction was upheld in Shore Line without discussing equitable constraints. Id.

Nevertheless, defendants insist that ALPA's argument that it

25

need not demonstrate irreparable injury in this case before an injunction may issue is wrong. Defendants cite Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982) and U.S. v. Microsoft Corp., 147 F.3d 935 (D.C. Cir. 1998), in support of their argument. Those cases, neither of which is decided under the RLA, generally stand for the proposition that a party is not necessarily entitled to a preliminary injunction merely because it has demonstrated a likelihood of success on the issue of whether a statute has been violated. The cases recognize, however, that if Congress intended that a statute confer a right to an injunction once a certain showing has been made, the party need not establish more than the statute specifies. In the context of requests for a status quo injunction under the RLA, the Supreme Court has found that district courts may enjoin violations of the status quo pending completion of required procedures without the customary showing of irreparable injury. The Court declines the defendants' invitation to rule that the Supreme Court was wrong. Accordingly, the Court need not further consider whether the plaintiff is likely to suffer irreparable harm in the absence of a preliminary injunction.

Even if the Court were required to determine whether

irreparable harm would result in the absence of a preliminary injunction, however, the Court would so find in this instance. In the Court's view, the prospect of the complete loss of union work and union jobs to an affiliated non-union entity is plainly irreparable.

III. Other Equitable Considerations

To the extent the Court needs to address the balance of the harms and the effect of an injunction on the public interest, the Court finds that these factors weigh in the plaintiff's favor.

A.    Balance of the Harms

As discussed above, the Court finds that the harm to ALPA and the Pan Am pilots in the absence of an injunction is grave. The Court has considered the defendants' arguments and finds them to be without merit.

The evidence shows that the work that the defendants seek to perform through Boston-Maine is the exact same work that is now being performed through Pan Am. While defendants assert that Pan Am has been unprofitable, Nadolny testified that Boston-Maine has also been unprofitable. There is no evidence to support a finding that Boston-Maine's 727 operation, if not enjoined, will be more profitable than Pan Am's for any reason other than that

27

the defendants will avoid Pan Am's obligations under the CBA. Pan Am and Boston-Maine have the same corporate leadership, therefore there is no reason to find that Boston-Maine is better managed than Pan Am. The evidence shows that numerous Boston-Maine employees were formerly employed by Pan Am and that Boston-Maine seeks to employ more Pan Am employees. Moreover, the evidence showed that Boston-Maine's employees are being trained by Pan Am employees.

Defendants protest that Boston-Maine and its employees will be harmed if an injunction is granted because ALPA waited until the eleventh hour to seek to avoid harm that it proclaimed has been coming since it first opposed Boston-Maine's requests to expand its operations. That argument ignores that Boston-Maine has also known during that same time period that ALPA vigorously opposed Boston-Maine's requests for regulatory approval to start a 727 operation for two years. It should come as no surprise to the defendants that ALPA has sought judicial intervention to stop the defendants, two of which are not bound by the CBA, from bringing the harm that it feared to fruition.

Defendants' remaining assertions of harm similarly lack merit. Defendants argue that Pan Am employees may be harmed if

they lose an opportunity to become employed by Boston-Maine once Pan Am shuts down. It is disingenuous to suggest that Pan Am's unionized employees will suffer greater harm from an injunction that prohibits the defendants from diverting Pan Am's existing work to Boston-Maine because those employees might lose opportunities to "start over" at non-union Boston-Maine.

The Court further finds hollow defendants' argument that ALPA should not be granted an injunction because it has not presented evidence that Pan Am will stay in existence beyond October 31st. This argument turns logic on its head. Pan Am's owners, not its employees, determine how long it operates. Despite this, Pan Am's unionized employees had a reasonable expectation under the RLA that Pan Am would not be replaced by a duplicate operation at an affiliated non-union airline. For these reasons, the Court finds that the balance of the harms favors the grant of an injunction.

B. Public Interest

The Court further finds that the public interest favors granting immediate relief to protect the statutory rights of ALPA and the Pan Am flight crewmembers it represents and to uphold the policies behind the RLA. The Court finds no evidence that an

injunction will have an adverse affect on the public interest.

The evidence shows that the defendants jointly control the scheduling and operation of Pan Am's and Boston-Maine's flights, and that Pan Am's flying has been reduced in conjunction with the expansion of the Boston-Maine 727 operation. There is no evidence that Pan Am's existing 727 aircraft operation is not able to handle all of the defendants' 727 flying needs for the foreseeable future.

The Court rejects defendants' argument that there could be disruption to fare-paying passengers' travel arrangements if Pan Am is barred from exercising its authority to subcontract with other carriers, including Boston-Maine, from time to time to ensure smooth service. ALPA does not argue that Pan Am should be prohibited from subcontracting with other carriers as necessary to provide service to Pan Am's passengers. Substantial evidence has been provided that at least some Pan Am flying has been diverted to Boston-Maine for reasons other than a flight crew shortage or mechanical failure. If granted, a preliminary injunction would merely prohibit the defendants from using its non-union affiliate to perform work that unionized Pan Am has traditionally performed, and is fully capable of performing.

30

Accordingly, the Court finds that the public interest favors the grant of an injunction.

## Conclusion

For the reasons set forth above, the Court recommends that ALPA's motion for a preliminary injunction (document no. 3) be granted, and the parties ordered to maintain the pre-dispute status quo during the statutorily-mandated dispute resolution procedures. Specifically, the Court recommends that, upon the posting of adequate security by ALPA, that the defendants, Pan American Airlines, Inc., and their officers, agents, servants, employees, attorneys, and those persons acting in active concert or participation with them who receive actual notice of this order by personal service or otherwise be ordered to take the following acts:

1. Restore to the status quo rates of pay, rules and working conditions of the Pan Am flight crewmembers as they existed on July 15, 2004, including but not limited to, all those embodied in the Pan Am-ALPA collective bargaining agreement, until all required bargaining, mediation and dispute resolution procedures of the RLA are exhausted.

2. Refrain from using Boston-Maine, or any other affiliated operation, to operate B-727s or other large jet aircraft in service traditionally performed by Pan Am and that Pan Am is capable of performing.

3. Refrain from transferring to Boston-Maine any aircraft from the Pan Am certificate to the Boston-Maine certificate.

31

Any objections to this Report and Recommendation must be filed within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

James R. Muirhead
United States Magistrate Judge

Date: September 17, 2004

cc: Andrew W. Serell, Esq.
    Julie P. Glass, Esq.
    Marcus C. Migliore, Esq.
    Eric L. Hirschhorn, Esq.
    Joseph E. Schuler, Esq.
    R. Matthew Cairns, Esq.
    William G. Miossi, Esq.